**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
|  | * |  |
| CX REINSURANCE CO. LTD., | * |  |
| **Plaintiff** | * |  |
| **v.** | * | **CIVIL NO.  JKB-15-2174** |
| STEWART J. LEVITAS *et al.*, | * |  |
| **Defendants** | * |  |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM

Plaintiff CX Reinsurance Company Limited ("CX Re") filed suit for declaratory judgment against Defendants Stewart J. Levitas and Brayon J. Loyal and asked the Court to declare the parties' rights and obligations under two commercial general liability insurance policies issued by CX Re to State Real Estate, Incorporated ("SRE"), in relation to rental properties owned by SRE.  (Compl., ECF No. 1.)  Levitas was sued individually and in his capacity as trustee of SRE's assets.  Although Loyal filed an answer (ECF No. 4), Levitas did not file a response to CX Re's complaint, and the Clerk entered a default against him.  (ECF No. 8.) CX Re filed a motion for summary judgment (ECF No. 11), Loyal filed a cross-motion for summary judgment (ECF No. 14), and both were fully briefed (ECF Nos. 15, 17).  Besides those motions, CX Re has filed a motion for leave to file an amended complaint (ECF No. 16), which Loyal has not opposed, and a motion to dismiss pursuant to Federal Rule of Civil Procedure 41(a)(2) (ECF No. 20), which also has been briefed (ECF Nos. 21, 26).

The Court has reviewed all of these filings and concludes CX Re's motion for summary judgment will be granted, Loyal's motion for summary judgment will be denied, the motion to amend the complaint will be granted, and the motion to dismiss will be denied.

The basis for CX Re's motion to dismiss is its representation to the Court that the insurance policies, hereinafter referred to in the singular, were rescinded by agreement of the parties in the case of *CX Reinsurance Company Limited v. Stewart J. Levitas, Individually and as the Trustee of the Assets of State Real Estate, Inc., et al.*, Civ. No. JFM-15-3326 (D. Md.).  Thus, CX Re asserts the declaratory judgment action is moot.  Loyal opposes the motion to dismiss, arguing she is a third-party beneficiary of the insurance policy and the policy cannot be rescinded without her consent.  (Def. Loyal's Opp'n 3, ECF No. 21.)  She also claims detrimental reliance, asserting a claim of promissory estoppel.  (*Id.* 4.)  She further accuses CX Re of fraud, and she states the rescission does not apply to her claim because it arose in 1996-98 when she was a young child living with her family in one of SRE's rental units, during which time she was diagnosed with elevated blood lead levels.  (*Id.* 1, 7.)  None of her arguments has legal merit.  But for reasons to be stated later, the motion will be denied.

Maryland law is quite restrictive on the issue of whether one may be considered a third-party beneficiary:

> At common law, only a party to a contract could bring suit to enforce the terms of a contract.  The common law rule has expanded to permit third-party beneficiaries to bring suit in order to enforce the terms of a contract.  An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise.  It is not enough that the contract merely operates to an individual's benefit:  An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012) (internal quotation marks and citations omitted).  Section 302 of the Restatement (Second) of Contracts, cited with approval in Maryland case law, provides:

> (1) [U]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Id.*

The Maryland courts have noted a decisive distinction between intended beneficiaries and incidental beneficiaries.  *Id.*  To determine on which side of that distinguishing line an individual or entity falls, courts "look to the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention."  *Id.* at 213 (internal quotation marks omitted).  Loyal unpersuasively claims she is an intended beneficiary of the policy "as the contract specifically identified her by address in listing her specific property in the policy."  (Def. Loyal's Opp'n 3.)  She has cited no case that supports her overly generous reading of the policy.  Those named as "insureds" of the policy are the following:  SRE, Brick Three, Brick Four, Brick Five, Stewart RFeal [*sic*] Estate, Stewart J. Levitas, Leon Miller Trust, Muriel Miller, Rose Levitas, Freedent Properties, Sylvan Feldman, Bricks One Corp., and Brick Two Corp.  (Policy, Schedule of Named Insureds, p. 3, Compl. Ex. B.)  The long list of rental properties covered by the policy, *id.* at pp. 4-7, is not included in the Schedule of Named Insureds, and nowhere in the policy are the properties themselves or the tenants of those

3

properties referred to as "insureds."  The basic insuring agreement was for CX Re to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  (*Id.* at p. 12.)  It is plain that the policy was intended by the promisor and promisee to provide some financial protection to the insureds in the event the insureds became legally obligated to pay damages for bodily injury or property damage.  Nowhere in the policy is any recognition by promisor and promisee of Loyal or any other tenant as a "primary party in interest."  The policy could conceivably have operated to Loyal's benefit, but that merely means Loyal was an incidental beneficiary of the policy.  As such, she has no enforceable right by virtue of the policy against either CX Re, the promisor, or the insureds, the promisees.  *See CR-RSC Tower*, 56 A.3d at 212.  *See also Weems v. Nanticoke Homes, Inc.*, 378 A.2d 190, 196 (Md. Ct. Spec. App. 1977) ("a party claiming third-party beneficiary status must 'show that [the contract] was intended for his direct benefit' and that such intent stemmed from the promisee's status as a debtor of the third-party, or from donative motives").  Thus, Loyal has failed to show she is a third-party beneficiary of the policy.

Even if Loyal could be considered a third-party beneficiary, she would still be "subject to the same defenses against the enforcement of the contract, as such, as exist between the original promisor and promisee."  *Shillman v. Hobstetter*, 241 A.2d 570, 577 (Md. 1968).  Although it has been recognized that "[a] liability insurance policy is 'generally issued for the benefit of third parties who are injured and have a claim against a tortfeasor,'" 7 Couch on Insurance § 104:8 (3d ed. 2003), *quoted in Phillips v. Allstate Indem. Co.*, 848 A.2d 681, 691 (Md. Ct. Spec. App. 2004), it is nevertheless also true

> that the right of the injured claimant to collect from the insurer of the one who harmed him derives from the contract right of the tortfeasor to have the insurer pay for him within the policy limit what otherwise he would be liable to pay.  As the third party beneficiary of the insurance contract, the claimant stands in the

shoes of the insured wrongdoer and vis-à-vis the insurer his rights are no greater
than those of the insured's.

*Travelers Ins. Co. v. Godsey*, 273 A.2d 431, 434 (Md. 1971).

As previously noted, CX Re has indicated to the Court in its motion papers that the policy
at issue has been rescinded in conjunction with a joint stipulation of dismissal of CX Re's claim
against Levitas in the other case, JFM-15-3326.  (*See* Pl.'s Mot. Dismiss 2-3, ECF No. 20.)  In its
complaint in JFM-15-3326, CX Re had asserted that SRE, Levitas's company, misrepresented
material facts in SRE's application for the policy by responding negatively to the question, "Has
the Insured ever had any lead paint violations in the buildings?," that CX Re relied upon that
representation in deciding to issue the policy, that SRE's answer to that question was false and
misleading, and that CX Re had only learned of the misrepresentation shortly before filing the
suit for rescission.  (JFM-15-3326, Am. Compl. ¶¶ 12-16, 18-20, 34-35.)  If it is true that the
policy was rescinded due to material misrepresentation in its inception, then any claim that Loyal
would make under the policy is also subject to the same defense.  However, no evidence of that
specific basis for rescission has been provided to the Court.  The rescission case, JFM-15-3326,
did not proceed to judgment, and the Court did not order rescission.  The case was simply
dismissed by stipulation of the parties.  Without clear evidence of a valid defense of
unenforceability due to material misrepresentation, the Court has no basis for applying that same
defense to Loyal.  Thus, the motion to dismiss will be denied.

Although the Court is denying CX Re's motion to dismiss, the Court notes that Loyal's
other theories in opposition to the motion are also aimed at precluding rescission of the policy,
not just dismissal of the instant case, but they, too, are without merit.  Loyal has cited no case
authority for her proposition that she is entitled to invoke the theory of promissory estoppel to

preclude the rescission of the insurance policy.  The elements of detrimental reliance are well-established:

> 1. a clear and definite promise;
>
> 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
>
> 3. which does induce actual and reasonable action or forbearance by the promisee; and
>
> 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996) (emphasis omitted).  Loyal proffers no evidence that she incurred bodily injury in reliance upon the insurance policy issued by CX Re to Levitas.  CX Re made no promises to her of any kind, and it does not stand in the role of promisor to her.  Hence, the theory of promissory estoppel is inapplicable in this case.  Even if a plausible argument on this basis could be constructed, Loyal's claim against CX Re, to the extent she has one, rises and falls upon the terms of the insurance contract.  Where a contract governs the relations between parties, the quasi-contractual theory of promissory estoppel does not apply.  *County Commissioners v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 608 (2000).

Loyal also makes a contorted argument that she was an infant when she was diagnosed with elevated blood levels and, therefore, she is a third-party beneficiary to the insurance policy, which means her rights under the policy are irrevocable.  The only case she cites is not on point, having to do with a separation agreement between husband and wife and the question of what rights were vested in their minor child, who was specifically named in the agreement and, thus, an intended beneficiary thereof.  *Spates v. Spates*, 296 A.2d 581 (Md. 1972).  Having earlier

concluded that Loyal was not an intended beneficiary of the insurance policy, the Court further concludes that she has never acquired irrevocable rights under it.

Loyal additionally invokes the Restatement (Second) of Contracts, § 311, comment *e*, for the proposition that CX Re and Levitas lost the power to rescind the insurance policy in the time period of 1996 to 1998 when she received diagnoses of elevated blood levels.  That excerpt is as follows:

> *e.  Effect of loss under insurance policy.*  The terms of the promise may make the beneficiary's right irrevocable in whole or in part or only upon a condition. Thus a reserved power to change the beneficiary of a life insurance policy terminates on the death of the insured. In general the power of promisor and promisee to vary the duty to a beneficiary under other types of insurance policies is understood to be subject to a similar limitation:  when an insured loss occurs, the power to vary the terms of the policy with respect to that loss is terminated.

> **Illustration:**

> 5. A contracts with B for liability insurance covering any person operating A's automobile with A's permission. C incurs liability covered by the policy. Thereafter A and B agree to rescind the policy. The attempted rescission does not affect the rights of C or the person to whom he is liable.

This section does not, however, create rights in Loyal that she does not otherwise possess. Comment *e* simply reinforces the earlier conclusions that Loyal was only an incidental beneficiary with no enforceable rights in the insurance policy and that she has no greater rights to indemnification under the policy than Levitas may have had.  If the policy was not enforceable by him due to the material misrepresentation in the application for coverage, then Levitas was not entitled to indemnification by CX Re, and neither would be Loyal.  She has cited no Maryland case law in which comment *e* to § 311 has been applied, much less in which it has been found to trump an insurer's valid defenses to enforcement of the contract.  Furthermore, comment *e* depends upon an "insured loss."  As will be explained, *infra*, any loss claimed by Loyal was not an insured loss, *i.e.*, a loss covered by the insurance policy.

Loyal's final argument holds no water.  She essentially claims CX Re committed fraud against her by not putting her on notice that it was filing its suit to rescind the insurance policy. She cites no law whatsoever to support her position.  This argument, as with her other arguments against rescission, is without merit.  Having found that the motion to dismiss cannot be granted, however, the Court turns to the cross-motions for summary judgment.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  *Id.* at 252.  The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).  Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

Each cross-motion for summary judgment is viewed separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citation omitted).

The crux of both motions for summary judgment is whether the insurance policy provided liability coverage to the insureds for the injury claimed by Loyal. Thus, the contract's terms must be consulted.

"Maryland adheres to the principle of the objective interpretation of contracts." *Cochran v. Norkunas*, 919 A.2d 700,709 (Md. 2007). If a contract's language is unambiguous, then the Court gives effect to its plain, ordinary, and usual meaning, taking into consideration the context in which the language is used. *John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1074 (Md. 2010). "When the language of the contract is plain and unambiguous there is no room for construction . . . ." *General Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). A "contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Cochran*, 919 A.2d at 710 (internal quotation marks and citation omitted).

The endorsement to the policy in question is entitled "Coverage Limitation – Lead Contamination." (Policy p. 9.) It states that it modifies the insurance provided under the "Commercial General Liability Coverage Part." Section I, entitled Exclusions, states:

> This insurance does not apply to . . . (3) "Bodily injury", "property damage", advertising injury", "personal injury" or medical payments arising out of the ingestion, inhalation, absorption of, or exposure to, lead, lead-paint or other lead-based products of any kind, form or nature whatsoever.

Then, Section II, entitled Coverage Limitation, states:

(a.) Exclusion (3) above does not apply to and we will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" arising out of the Ingestion, Inhalation, absorption of, or exposure to lead, lead-paint or other lead-based products of any kind, form or nature whatsoever to which the insurance provided by this endorsement applies.  We will have the right and duty to defend any "suit seeking those damages.   We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.  But;

(1) The amount we will pay for damages is limited as described in COVERAGE LIMITATION LIMITS OF INSURANCE (SECTION III); AND

(2) Our right and duty to defend end when we have used up the applicable limit of Insurance in the payment of the judgments or settlements.

(b.) This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "occurrence" is not before the beginning of the Policy Period shown in the Declarations of this policy; and

(3) The "property damage" first occurs during this policy period; or

(4) For "bodily injury" a lead level in blood, bone or body tissue in excess of the "safe level" is first diagnosed by a State licensed physician or other State licensed health care provider during this policy period; and

(c.) With respect to the insurance provided by this endorsement the following additional Exclusions apply:

This insurance does not apply to:

"Bodily injury" or "property damage" caused by an "occurrence" at premises sold, given away or abandoned by the insured prior to the beginning of the Policy Period shown in the Declarations of this policy.

(*Id.* pp. 9-10.)

Section III provides the limits of insurance under this endorsement, and Section IV defines "safe level" as meaning "10 micrograms of lead per deciliter of blood as prescribed by the Centers for Disease Control." (*Id.* pp. 10-11.)

Loyal argues that the endorsement quoted above provides two alternatives for liability coverage: either "the bodily injury is caused by an occurrence that takes place in the policy's coverage territory and the occurrence does not take place before the beginning of the policy period," or a lead level in excess of the "safe level" was first diagnosed during the policy period. (Def.'s Mot. Summ. J. Supp. Mem. 2-3, ECF No. 14.) She places great emphasis upon the use of the word "or" between II(b.)(3) and II(b.)(4), contending that word establishes the disjunctive nature of Section II's various parts. (*Id.* 4, 13.) She indicates she can establish coverage under the first of these proposed disjunctive interpretations.

Loyal's preferred construction is strained and violates the settled principle of giving effect to a contract's plain and ordinary meaning. Indeed, Loyal's interpretation of the endorsement does not even require an occurrence of bodily injury during the policy period if one reads subsections 1 and 2 in isolation; that is, the occurrence could happen at any time as long as it does not happen before the beginning of the policy period. But under the established canons of contract interpretation, all of Section II must be read together. By doing so, one finds the limitations of subsections 1, 2, and 4 applicable to bodily injury and the limitations of subsections 1, 2, and 3 applicable to property damage. Since the endorsement applies to both bodily injury and property damage, it makes sense to put the coverage limitations for both in one section, with the understanding that some differentiation between the coverage limitations for bodily injury and property damage necessitates separate qualifiers for each of the types of liability coverage. What applies to property damage in subsection 3 is obviously inapplicable to

bodily injury, and the reverse is true for what applies to bodily injury in subsection 4.   In determining the plain meaning of the endorsement at issue here, the Court has not considered the "expert testimony" as to the correct interpretation of it that was proffered by Loyal in her motion for summary judgment.  (*Id.* Ex. C.)  The interpretation of the insurance policy is a question of law to be decided by the Court.  *See Forrest Creek Associates, Ltd. v. McLean Sav. And Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987).

So, the question that must be answered is whether Loyal has shown she meets the coverage limitations of Section II and, in particular, subsections 1, 2, and 4.  Thus, did she first have a diagnosis of a lead level in excess of 10 micrograms per deciliter that took place in the coverage territory during the policy period but not before the beginning of the applicable policy period?  Because the policy consisted of two virtually identical policies, the beginning of the policy period of the first policy was August 1, 1997, and the second policy began on August 1, 1998.   In her state court personal injury suit against Levitas, Loyal provided answers to interrogatories that shed light on the proper answer to the Court's question.  In response to Interrogatory No. 15, which said, "Please state specifically the date on which you were first diagnosed as suffering from plumbism and the identity of the individual or entity by whom you were so diagnosed," Loyal answered she was diagnosed with a blood lead level of 3 on September 26, 1996, and a blood lead level of 6 on October 6, 1998.  (*Id.* Ex. B, p.28, ECF No. 14-2.)  In response to another interrogatory, No. 24, she stated, while she resided at the rental property in question, "she was found to have blood lead levels in excess of 5μg/dL."  (*Id.* p. 32.)  In her state court complaint, she said she "lived at the property from approximately 1998 to approximately May, 1999."  (Compl. Ex. A, ¶ 4.)  Loyal has proffered no evidence that she was first diagnosed with a blood lead level greater than 10 micrograms per deciliter during the

time period of August 1, 1997, to August 1, 1999.  Such evidence, if it exists, would be within her possession or readily obtainable by her from her medical providers.  She has not even proffered that any evidence on this point actually exists.  Her attorney's Rule 56(d) affidavit is noticeably deficient on this decisive point.  (*See* Def. Loyal's Mot. Summ. J. Ex. A, ECF No. 14-1.)

Consequently, the Court concludes no genuine dispute of material fact exists, that Loyal is not entitled to summary judgment, and that CX Re is entitled to summary judgment as a matter of law.  The Court's conclusion, of course, does not affect one way or the other the merits of her state court claim directly against Levitas, which is founded upon principles of tort and statutory law applicable to landlords and tenants, not upon principles of contract law in relation to the insurance policy.

A separate order will enter.

DATED this 14th day of September, 2016.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge